**In re Curtis Mitchell SAMMONS, Debtor.**

**Bankruptcy No. 96–04230.**

U.S. Bankruptcy Court,
N.D. Florida,
Pensacola Division.

April 30, 1997.

Steven Bowden, Pensacola, FL, for Steve Anderson.

Amy L. Sliva, Pensacola, FL, for debtor.

John E. Venn, Jr., Pensacola, FL, Chapter 7 Trustee.

LEWIS M. KILLIAN, Jr., Bankruptcy Judge.

### Findings of Fact

The debtor is a heavyweight boxer. On January 1, 1995, he entered into a contract with SMA Boxing, Inc. ("SMA"). The term of the contract is for the term of the debtor's professional boxing career. Regarding compensation, the contract provided that "Steve Anderson will pay Mitchell Sammons a $5,000.00 signing bonus and a salary of $40,-000.00 a year for 1995 with semi-monthly payments as long as Sammons is in compliance with the terms of this Agreement." Furthermore, there was testimony that the debtor could earn, conservatively, an additional $500 to $1,000 per fight. The contract also provided that the debtor would participate in at least five boxing matches in 1995, and at least three per year thereafter.

SMA did not arrange for the debtor to fight during the first four months of 1995 because the debtor was training and getting into shape. Thereafter, the debtor was injured and had to have shoulder surgery in June of 1995. SMA had arranged for the debtor to participate in five fights during 1995, but those fights had to be canceled due to the debtor's injuries. The debtor was not released to box again until late 1995 or early 1996.[1] SMA arranged a fight for the debtor in March of 1996, but the debtor refused to fight. Steve Anderson paid the debtor approximately $40,000 to $45,000 during 1995, even though the debtor could not box due to injuries. Several of these payments were late. In September of 1995 the debtor moved to Pensacola to train with Square Ring, Inc. The debtor lived in a dormitory at Square Ring Gym intermittently from that point forward. The debtor desired to hire Square Ring, Inc., to train him and promote his boxing career [2].

The debtor filed his case under chapter 7 of the Bankruptcy Code on February 23, 1996. Stanley Levin, a principal of Square Ring, Inc., had suggested that the debtor file for bankruptcy and paid his attorney's fees. The debtor's schedules indicate that he had $950 in assets and $41,667 in liabilities, all of which is purportedly owed to Anderson for 1995 wages and other "unknown amounts." Anderson filed a motion to dismiss the case as a bad faith filing on June 12, 1996, on the grounds that he is the only creditor for whom a debt is listed, and the debtor's sole reason for filing bankruptcy was to avoid the contract with SMA. On October 22, 1996, the debtor amended his schedules and listed an additional $12,707.91 in debts owed to eight additional creditors.

### Conclusions of Law

As mentioned above, I previously ruled that, under certain circumstances, a case under Chapter 7 may be dismissed if it is filed in bad faith. Thus, the sole issue to be determined is whether the facts of this case present circumstances sufficient to justify dismissal.

Anderson argues that the debtor filed this case in bad faith because the debtor's sole purpose was to avoid the contract with SMA. Anderson states that bad faith can be discerned from the debtor's original schedules, in which the only listed debt is owed to Anderson, and the fact that Stanley Levin, a boxing promoter who the debtor wanted to hire, suggested that the debtor file for bankruptcy and paid his attorney's fees.

The debtor relies on several cases which, he argues, stand for the proposition that a debtor may file for bankruptcy for the primary purpose of rejecting a personal services contract. *In re Taylor*, 913 F.2d 102 (3rd Cir.1990) (holding that a Chapter 11 debtor-singer may reject a recording contract); *All Blacks B.V. v. Gruntruck*, 199 B.R. 970 (W.D.Wash.1996) (affirming bankruptcy court holding that a chapter 7 debtor-band may reject a recording contract); *In re Noonan*, 17 B.R. 793 (Bankr.S.D.N.Y.1982) (allowing a Chapter 11 debtor-singer to convert to Chapter 7 for the purpose of rejecting a recording contract).

What the debtor fails to mention, however, is that in each of these cases, the debtor was experiencing real financial hardship. In *Taylor*, the debtor's schedules listed assets totaling $734,215, and liabilities totaling $4,518,701.50. *Taylor*, 913 F.2d at 105. The court described the debtor's financial condition in the following manner:

> When the bankruptcy petition was filed, Mr. Taylor was in the following unenviable position: he was owed substantial amounts by Group entities, but with virtually no prospect of payment; he was contractually

---

1. The debtor contends that he was 100% and able to resume fighting in September of 1995. However, a letter from the Florida Orthopaedic Institute, dated September 25, 1995, (admitted as plaintiff's exhibit 8) indicates that the debtor was not ready to return to the ring at that time. Dr. Gasser requested another visit in two months to determine if the debtor was ready to resume boxing. A second letter from the Florida Orthopaedic Institute, dated February 27, 1997, (ad-

mitted as plaintiff's exhibit 4) states that the debtor has been released to full activities.

2. Plaintiff's exhibit 5 is a letter from Stanley Levin, of Square Ring, Inc., to Steve Anderson stating that the debtor would like to hire Square Ring, Inc., to train him and promote his boxing career.

obliged to write and perform enough musical compositions to provide at least seven additional albums, but any revenues these efforts might generate would be retained by The Group's creditors; and he had personally guaranteed the obligations of The Group and its related entities in amounts greatly in excess of the remaining equity in his home, which was his only significant asset.

*Id.* In *All Blacks,* the court accepted the debtor's "assertion that it was experiencing real and immediate financial hardship." *All Blacks* 199 B.R. at 975. In each case, the respective court affirmed a lower court's finding that there was no evidence of bad faith requiring dismissal. *Taylor,* 913 F.2d at 106; *All Blacks,* 199 B.R. at 975.

The Eleventh Circuit addressed the issue of filing bankruptcy petitions in bad faith in *In re Waldron,* 785 F.2d 936 (11th Cir.1986). In that case, "the Waldrons admittedly filed their Chapter 13 petition for the sole purpose of rejecting the option agreement with Shell Oil." *Waldron,* 785 F.2d at 939. The Waldrons were not experiencing legitimate financial distress at the time they filed their petition. *Id.* "Nevertheless, the bankruptcy court permitted the Waldrons to reject the option contract because 'it is clear that [the Waldrons] could readily refile their bankruptcy petition under Chapter 11.'" *Id.* (Quoting *In re Waldron,* 36 B.R. 633, 635 (Bankr.S.D.Fla.1984)). In addressing the bankruptcy court's comments, the Eleventh Circuit stated:

> Apparently, the bankruptcy court relied on cases which hold "that it is not an abuse of the bankruptcy process to file a petition under Chapter 7 or 11 solely to reject an executory contract." (citations omitted). The bankruptcy court, however, failed to recognize the true import of these decisions. In each case, rejection of the executory contract served a useful purpose for a debtor who was indeed financially troubled.

*Id.* Thus, although *Waldron* is a Chapter 13 case, it seems clear from the language quoted above that the Eleventh Circuit would apply the same standard to cases under Chapter 7.

In this case, there has been no evidence presented that the debtor is experiencing real financial distress. The debtor earned between $40,000 and $45,000 from SMA during 1995. There has been evidence presented that SMA has arranged boxing matches for the debtor, and that the debtor could conservatively earn between $500 and $1,000 per fight on an ongoing basis. However, the debtor was not satisfied with the direction his career was moving in and he wanted a change. He testified that he filed a bankruptcy petition instead of seeking rescission of the contract in state court because he could not afford an attorney, and because he did not want to be tied up in a lengthy court proceeding instead of boxing. Levin, the boxing promoter whom the debtor desired to hire, suggested that the debtor file a bankruptcy petition and paid the debtor's attorney. The debtor's original schedules list only one debt, consisting of 1995 wages paid by Anderson, premised on an anticipated rejection of the contract. Absent a breach of contract, there would be no debt to Anderson. Moreover, there was no evidence presented that the debtor would not be able to earn a living under the SMA contract, or that rejection was necessary for him to escape financial distress.

Based on the foregoing, I find that the debtor is not in real financial distress, and his only purpose for commencing a case under Chapter 7 was to avoid the contract with SMA in order to sign what he perceived to be a more lucrative contract with Square Ring, Inc. I find this to be an abuse of the bankruptcy process based on the rationale set forth in *Waldron.* Accordingly, it is

ORDERED AND ADJUDGED that this bankruptcy case be, and hereby is, DISMISSED.

### *ORDER DISMISSING CASE*

This matter came before the Court upon the motion of Steve Anderson, creditor, to dismiss this bankruptcy case as a bad faith filing. A hearing was held on December 19, 1996, to determine the threshold issue of whether a case under Chapter 7 of the Bankruptcy Code may be dismissed for a lack of good faith. After considering the arguments

of counsel and relevant case law, I entered an order, dated January 6, 1997, holding that a case under Chapter 7 may be dismissed, under certain circumstances, for bad faith. An evidentiary hearing was held on March 27, 1997, to determine whether this case was filed in bad faith, and is, therefore, subject to dismissal. At the hearing, after considering the evidence presented, the arguments of counsel, the record in this case, and relevant case law, I found that the debtor filed this case solely to avoid a contract between himself and SMA Boxing, Inc., the debtor was not in financial distress, and that a filing under these circumstances was an abuse of the bankruptcy process. As a result, I ruled that this case be dismissed. The following findings of fact and conclusions of law supplement and further explain my earlier rulings pursuant to Fed. R. Bankr.Pro. 7052.